# IN THE UNITED STATES DISTRICT COURT

# DISTRICT OF NEW MEXICO
_____

IGNACIO MARTINEZ, SR. and
CHARLOTTE MARTINEZ,

        Plaintiffs,

        v.                                   Civ. No. 1:14-cv-00041 WJ-KBM

PAUL MARES, ROBERT GONZALES,
BLAIR JACKSON, in their individual capacities, and
THE CITY OF RATON,

        Defendants.

## MEMORANDUM OPINION AND ORDER
## GRANTING IN PART and DENYING IN PART
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

THIS MATTER comes before the Court upon Defendants' Motion for Summary

Judgment, filed April 3, 2014 **(Doc. 14)**.   Having reviewed the parties' briefs and applicable

law, the Court finds that Defendants' motion shall be GRANTED in part as to Plaintiffs' Fourth

Amendment claim based on the initial stop, but DENIED as to Plaintiffs' other Fourth

Amendment claims, and DENIED as to Plaintiffs' state law claims.

## BACKGROUND

Plaintiffs Ignacio Martinez Sr. (hereinafter, "Mr. Martinez") and Charlotte Martinez are

an elderly couple (ages 77 and 79 years of age, respectively) who allege that Defendants violated

Plaintiffs' federal constitutional rights and violated state tort law during an incident which

occurred on December 23, 2012 in Raton, New Mexico.   On that day, Plaintiffs claim that they

drove by their grandson's house to drop off a Christmas present, but that Jason Martinez, the

grandson ("Jason"), never came out to retrieve his present despite the fact that Plaintiffs honked

the horn to get his attention inside the house.   Jason did not see who was in the car, but had called for police assistance because he feared that his father, Ignacio Martinez Jr., who had shot him two months earlier, could possibly be driving the car.

Plaintiffs allege that the individual Defendants, who were police officers employed by the City of Raton, forcefully arrested Mr. Martinez even though the officers had no lawful reason to believe that Mr. Martinez, Sr. ("Mr. Martinez" or "Plaintiff" for purposes of this opinion) posed a threat either to the officers or to Jason.   Plaintiffs also contend that the pat down search that was conducted was unreasonable because Defendants had no particularized and objective information amounting to reasonable suspicion to believe that Mr. Martinez was armed.  As a result of the rough manner in which one of the officers conducted the pat-down search, Mr. Martinez' colostomy bag was perforated, causing his stoma to bleed and causing fecal matter to leak.   Plaintiff also required surgery as a result of significant injury to his index finger. Plaintiffs allege damages in that Mr. Martinez suffered and continues to suffer significant physical injuries and emotional distress, and continued medical expenses as a result of Defendants' conduct.

Plaintiffs assert claims under the First and Fourth Amendments to the United States Constitution and under the New Mexico Constitution; under the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act of 1973; and under the New Mexico Tort Claims Act (Section 41-4-1 to -29, NMSA 1978) ("Tort Claims Act").   Specifically, the Complaint alleges nine counts, as follows:

- Count I:  Fourth Amendment based on the unreasonable seizure of Mr. Martinez, asserted against Defendants Mares, Jackson and Gonzales;

- Count II:  Fourth Amendment based on the unreasonable search of Mr. Martinez' pockets, asserted against Defendant Mares only;

- Count III:   Fourth Amendment based on an unreasonable pat-down search of Mr. Martinez, asserted against Defendants Mares, Jackson and Gonzales;

- Count IV:  First Amendment Retaliation for Free Speech, asserted against Defendant Mares and Jackson;

- Count V:  False Arrest and Imprisonment under the Tort Claims Act, asserted against all Defendants;

- Count VI:   Battery under the Tort Claims Act, asserted against Defendants Mares and Jackson;

- Count VII:  Unlawful Search and Seizure under the New Mexico Constitution;

- Count VIII:  Title II of the ADA and §504 of the Rehabilitation Act of 1973;

- Count IX:  Municipal Liability against the City of Raton.

Defendants deny Plaintiffs' allegations, and contend that they acted reasonably and in good faith.

## DISCUSSION

Defendants style the instant motion as a Motion for Summary Judgment, and state that they seek dismissal of "all of the Plaintiff's claims against them," (Doc. 14 at 19), yet Defendants' motion addresses only Plaintiffs' Fourth  Amendment claims in Counts I, II and III, and state tort law claims in Counts V, VI and VII.   Thus, the Court views the motion as one seeking partial summary judgment.

In their response brief, Plaintiffs state that Defendants have agreed to delay discovery on their ADA/§504 claim in Count VIII and on their municipal liability claim in Count IX until the resolution of the instant motion.   Doc. 31 at 2, n.2.   Also, Defendants requested a stay of discovery in their motion for summary judgment, which has already been addressed separately and granted by the Magistrate Judge.  *See* Doc. 19.

The Court notes some anomalies in both parties' pleadings which have made it difficult for the Court to conduct a cogent analysis of Defendants' motion.   On Defendants' part, the Court notes that:  (1) Defendants do not address Plaintiffs' First Amendment claim in Count IV at all even though Plaintiffs do not list this as one of the claims which is being deferred for discovery; (2)   Defendants offer argument on what they describe as Plaintiffs' "supervisory liability claims," but such claims are nowhere to be found among the claims asserted in the complaint;[1] and (3) what purports to be an attempt to discuss Plaintiffs' ADA claim is actually a statement of the law on racially selective law enforcement claims—which has no connection whatsoever to Plaintiffs' claims based on disability.  *See* Doc. 14 at 16-17.  With respect to the shortcomings on Plaintiffs' part, the Fourth Amendment claims in Counts I, II and III do not lend themselves to a proper analysis because of the way they are asserted in the complaint.   For example, Count I alleges unreasonable seizure, encompassing the circumstances surrounding not only the initial stop, but all the facts underlying the continued detention which included handcuffing Plaintiff.    Count II alleges an unlawful "search" of Mr. Martinez' wallet when Defendant Mares "made [Plaintiff] remove his wallet from his pocket and place it on the car." Compl., ¶ 59.   However, the complaint does not allege a Fourth Amendment violation based on Defendant's *search* of Plaintiff's wallet, and it seems that requiring an individual to place his wallet on the top of a car does not constitute a "search" for Fourth Amendment purposes.

In light of the different legal standards underlying the different stages of the stop and detention, the Court views the initial stop as a separate issue from the investigatory detention

---

[1] Further, Defendants' argument on the supervisory liability claims consists of a few paragraphs of black letter law, and no application of the law to any facts at all, much less to the specific facts in this case.

which followed, and the pat-down search as a separate issue from the investigatory detention.[2]
Unfortunately, Defendants' briefs do not offer any better organization of the arguments.   In fact,
Defendants' briefs contain no break-down at all as to the separate Fourth Amendment counts in
the complaint.   For this reason, the Court takes the approach that there are three Fourth
Amendment aspects to Plaintiffs' claims:  the initial stop, the continued detention, and the pat-
down search.   The Court includes Plaintiffs' Fourth Amendment allegations regarding the wallet
incident in the discussion on the continued detention.

## I.      Underlying Facts[3]

Plaintiffs dispute almost all of the facts, and all of the salient facts, from the inception of
the stop to the pat-down conducted by one of the officers to Plaintiff's subsequent release from
detention.   The Court presents both parties' facts together, including Plaintiff's statement of
additional facts, in order to grasp where the disputes lie on the various issues that will be
discussed later.[4]  The Court has also listened to Plaintiffs' Exhibits 6 and 9, audiotapes of the
incident by Defendants Mares and Gonzales, respectively; and Exhibit A submitted with
Defendants' reply, which includes tapes of 911 calls as well as the officers' encounters with
Plaintiff and with Jason.     The audiotapes of Defendants Mares and Gonzales appear to be
consistent, but not identical.  Defendant Mares' tape begins with ordering Plaintiff out of the car,
and Defendant Gonzales begins during the handcuffing.   The Court will refer to these exhibits
where appropriate and helpful to the analysis.

---

[2]   *See* Mares Depo., Doc. 31-1 at 45:12-14 (investigative detention began when Officer Mares ordered Plaintiff out of the car).

[3]   The Court's reference to "Plaintiff" in this discussion refers to Mr. Ignacio Sr., since the bulk of pertinent facts pertain to Defendants' actions toward him.

[4]   For ease of reading, citations to supporting evidence are provided here where necessary.   They are otherwise provided by the parties in the briefs setting out Defendants' statement of facts and Plaintiffs' statement of additional facts.

A.      Initial Stop

On December 23, 2012, Defendant Paul Mares of the Raton Police Department was on routine patrol with Defendant Officer Blair Jackson.   They were dispatched to a residence in response to a 911 call from Jason.   The officers were told that Jason's father, Ignacio Martinez, was on Jason's property, and that Mr. Martinez was reported to be driving a Red Dodge Magnum.   The officers knew that Jason was in fear for his life because his father had previously shot him in the face.   The officers were told that Jason had affirmatively identified his father as the person on the property.   Defendants claim that the officers were also told that Jason had a restraining order against his father and that dispatch did not provide a birth date for the father.

Plaintiff disputes that Defendants were told about the restraining order by dispatch prior to arriving at the area near Jason's residence.   He offers evidence that Officer Mares did not receive information from dispatch prior to arriving at the residence, including Officer Mares' deposition testimony that he did not call into dispatch to determine whether a restraining order was in place until after Officer Gonzales had arrived and Plaintiff was already in handcuffs.   *See* Doc. 31-1 (Mares Dep.) at 15:2-7; at 111:11-25; at 31:13-25.   Officer Mares also testified that he had prior knowledge of the restraining order before being dispatched to respond to Jason's call into the police station.  Doc. 31-1 at 15-16.   This is inconsistent with Officer Mares' statement in his affidavit that he was told about the restraining order by dispatch before arriving at the scene.[5]

Defendants claim that on arrival, Jason told the officers his father had been in front of his house honking the horn, that he was in fear for his life, and specifically afraid that his father had

---

[5]   In ¶4 of his affidavit, Officer Mares implies that dispatch advised him about the restraining order *before* he arrived at the scene, since ¶ 5 starts with "[w]hen I arrived . . ."  This is inconsistent with his deposition statements that he called into dispatch for information about the restraining order *after* Plaintiff was in handcuffs *or* that he knew about the restraining order prior to Jason's call.

returned to "finish what he started" (referring to when his father shot him in the face some weeks before).  Officer Mares told Jason to stay inside and call the police if there were any more problems.  The officers then left the scene, but parked a short distance away and kept an eye on the residence.  About five minutes later, Jason and his girlfriend tried to get in their vehicle and exit their driveway. As they did this, a red vehicle matching the description previously provided by Jason pulled up into the driveway at a high rate of speed.  It blocked Jason's vehicle and began to honk its horn.   The officers returned to the property.  Jason and his girlfriend Crystal were crying and screaming in fear.  Officer Mares told them to get back inside their home. Defendants also state that throughout the encounter, both Jason and his girlfriend "remained fearful and extremely agitated."  Officer Mares approached the red vehicle from the driver's side and Officer Jackson approached from the passenger's side.  At first the driver refused to open the window.    According to Defendants, when Plaintiff "finally obeyed requests to open the window," he said he had brought his grandson gifts.   In the meantime, dispatch confirmed that Jason had a restraining order against his father, Ignacio Martinez.

Defendants state that, after opening his window, Plaintiff presented a driver's license identifying him as Ignacio Martinez.  At this point Officer Mares believed this was probably Jason's father, who had shot his son in the face some weeks before and who was the subject of the restraining order.   Officer Mares did not know if "Ignacio Martinez" was armed but knew that Jason believed the driver of the red car was there to kill him.

Plaintiff disputes Defendants' statement that he refused to open his window, and states in his affidavit that the window was already open on Plaintiff's side by the time Officer Mares approached the driver's side.   Plaintiff agrees that he was asked if he had identification, but claims that before he could retrieve his driver's license from his wallet in his pants pocket,

Officer Mares ordered Plaintiff to get out of his car.   After Officer Mares told him to get out of his car, Plaintiff explained that they had brought Jason a Christmas gift.   Plaintiff disputes Defendants' statement that Officer Mares believed he was probably Jason's father, based on discrepancies in Officer Mares testimony.   Officer Mares stated in his affidavit that on arriving at the residence, Jason told him that his *father* was outside honking the horn; however, Officer Mares stated in his deposition that Jason told him that it was his *grandfather's* car that was honking.   *Cmp.* Doc. 14-1, ¶ 6 with Doc. 31-1 at 17-18.   Officer Mares also testified in his deposition that Jason told him that he "did not know who was in [the car]." Doc. 31-1 at 17:15.

Plaintiff disputes that he pulled up to his grandson's driveway at a high rate of speed. Doc. 31-4, ¶ 5.   He also states that the officers did not explain why they were stopped or the purpose of the officers' presence.   Plaintiff was never asked if he was Jason's father.   The officers did ask for identification, but Plaintiff disputes that he presented a driver's license to the officers which would have identified him as Mr. Martinez.

B.   Continued Detention and Search: Handcuffing and Pat-Down

Defendants' statement of facts continues with a description of the events occurring after Plaintiff exited his vehicle, stating that once outside his car, Plaintiff remained "aggressive and uncooperative."   Officer Mares stated that Plaintiff was "yelling and screaming" at the officers. Doc. 31-1 at 56:19-25.   Defendants state that Plaintiff refused to move away from the driver's side door out of reach of any possible weapons.   After Plaintiff continued to refuse to obey requests to move away from the driver's side door, Officer Jackson restrained his hand, and the officers then handcuffed him.   According to Defendants, Plaintiff was restrained after he refused to cooperate with the officers' investigation and refused reasonable commands to move away from the driver's side door of his vehicle.   Officer Mares told Plaintiff he was not under arrest,

8

but was being detained until they could "sort matters out."    Because the officers did not know if Plaintiff was armed and believed he might have been there to threaten Jason with deadly force, Plaintiff was searched for weapons using a standard pat down search.    Defendants state that "[d]uring this process," Officer Gonzales arrived.   He told the other officers the driver was not Jason's father, but his grandfather, Ignacio Martinez.   Plaintiff was then released from the handcuffs.

Plaintiff presents evidence which sets out the facts quite differently and which form a different chronology from that presented by Defendants.    Plaintiff claims that he exited his vehicle with considerable difficulty as a result of physical injuries sustained while serving in the military during the Korean War.   When Plaintiff was ordered by one of the officers to put his wallet on the car, he initially refused because it was his personal property.    On the officer's third request, Plaintiff tried to get his wallet out of his pants pocket, but before he could get it completely out, Officer Mares grabbed his left arm and began to twist it, and the other officer grabbed his right hand.   The officers paid no attention to Plaintiff's complaints of pain but kept twisting his arms and squeezing his hand while they handcuffed him.

Other than initially refusing to produce his wallet, Plaintiff insists that he did not attempt to fight with the officers, and that he was never told to move away from the driver's door.  Doc. 31-4, ¶ 11.   Plaintiff does not dispute that he was told he wasn't under arrest and was being detained to "sort things out," but disputes the chronology as described by Defendants.   He presents evidence supporting his version of the timeline, using Officer Gonzales' deposition testimony.    Officer Gonzales testified that when he arrived at the scene, Officer Mares and Jackson were in the process of handcuffing Plaintiff.  He heard Plaintiff yelling "I'm hurt, I'm hurt."   Doc. 31-2:31-32.    He told the officers that Plaintiff was not Jason's father, but his

grandfather.    Officer Gonzales stated that the officers continued to handcuff Plaintiff, even though they had just been advised that Plaintiff was not Jason's father.   *Id.*   Officer Gonzales also testified that the pat-down was conducted after Plaintiff was handcuffed, and *after* he had informed Officers Mares and Jackson that Plaintiff was Jason's "grandpa."   Doc. 31-2 at 32:1-10; at 33:9-12; Doc. 31-2 at 43:8-14 (Officer Gonzales' testimony that after Plaintiff was handcuffed, he told Plaintiff that they were going to do a pat-down search "and then we'll take the cuffs off.").   Officer Mares' testimony does not conflict with Officer Gonzales' testimony on this part of the timeline.   Officer Mares stated at his deposition that he was not there during the pat-down, but acknowledged that Officer Gonzales had arrived while Plaintiff was still in handcuffs.[6]   Doc. 31-1 at 81:6-8; at 77-78.   Thus, it appears to be undisputed that Officers Gonzales and Jackson conducted the pat-down search while the officers were fully aware that Plaintiff was not Jason's father.[7]

Plaintiff also disputes that the purpose of the pat-down was standard for a search for weapons, pointing to testimony by Officer Gonzales that at the time the pat-down was

---

[6]  Sounds heard on Officer Mares' audiotape support the factual contention that Officer Mares was not present during the pat-down.  After Officer Mares informed Plaintiff he was going to be searched, one can hear what is presumably Officer Mares' footsteps leaving the area and going toward another area, where he then questioned Jason.  Ex. 6 (audiotape), 3:00-3:20.

[7]  Defendants' statement in Fact No. 13 that Officer Gonzales arrived "during this process," referring to the handcuffing and pat-down, lends support to Plaintiffs' perception that Defendants have materially distorted the chronological order of events in order to make the officers' conduct appear reasonable.   In this case, the point at which the officers were aware of Plaintiff's identity as Jason's grandfather (rather than Jason's father) is crucial in considering the reasonableness of Defendants' conduct.   Defendants' use of the phrase "during this process" allows Defendants to suggest, without any supporting facts except for Officer Mares' affidavit (which glosses over the exact point of Officer Gonzales' arrival by the use of "during this process"), that the pat-down occurred *prior* to Officer Gonzales' arrival.  Indeed, Defendants' Fact No. 12 states that Plaintiff was searched for weapons, followed by Fact No. 13 which states that Officer Gonzales arrived "during this process."   In his deposition, Officer Mares stated that he "did not know" whether Officer Gonzales arrived before or after Plaintiff was searched for weapons.  However, all of the testimony relevant to the actual timeline supports Plaintiffs' contention that the pat-down occurred *after* the officers knew that Plaintiff was not Jason's father.

conducted, there was no suspicion that Plaintiff had committed a crime.   Doc. 31-2 at 33:13-17; at 30:14-21.

Defendants sum up their position by stating that the officers' conduct was directed to secure Plaintiff's cooperation and the officers' safety, that it was unrelated to any perceived disability, and that they used the least amount of force reasonably necessary under the circumstances.   Plaintiff offers facts supported by evidence which counter these contentions. According to his sworn testimony, Plaintiff asked Defendants to be careful during the search because he had a "plastic stomach," referring to his colostomy bag.   Officer Jackson, who conducted the search, pushed hard enough on the area of the stoma near Plaintiff's stomach, to causing Plaintiff to feel pain.   After his release from custody, Plaintiff still felt pain and on checking checked his stomach area, noticing blood near the stoma.   The colostomy bag had snapped off during the search and liquid feces had seeped out of the colostomy bag.   Plaintiff drove home to clean up, and then he and his wife drove the emergency room, since he still had pain in his right hand, neck and back.   The affidavit of Dr. Samuel Chun, M.D. states that Plaintiff's "trigger finger" required surgery.  Doc. 31-8, ¶ 4-5.[8]

## II.     Legal Standards

A.     Qualified Immunity

Defendants have asserted the defense of qualified immunity, which shields government officials from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."   *Pearson v. Callahan,* 555 U.S. 223, 231 (2009); *Romero v. Story,* 672 F.3d 880 (10th Cir. 2012).   For a

---

[8]   Defendants' facts are largely directed toward the officers' conduct toward Mr. Martinez, but Mrs. Martinez is also a named Plaintiff.   She states that after driving home, her husband called her into the bathroom to show her blood around the stoma.   Mrs. Martinez also states that having to keep her arm stretched out on the dashboard during the entire detention caused her "great physical pain."   Doc. 31-5, ¶ 12.

right to be clearly established there must be Tenth Circuit or Supreme Court precedent close enough on point to make the unlawfulness of the officers' actions apparent. *Weise v. Casper*, 593 F.3d 1163, 1167 (10th Cir.2010).   Defendants' assertion of the qualified immunity defense requires Plaintiffs to bear the burden of demonstrating that (1) Defendants violated a constitutional right and (2) the constitutional right was clearly established at the time of the alleged conduct.   *Reeves v. Churchich*, 484 F.3d 1244, 1250 (10th Cir.2007).  If Plaintiffs meet this burden, Defendants may still prevail by satisfying the usual summary judgment standard of showing that no material facts are in dispute and that he or she is entitled to judgment as a matter of law.   *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002).   The Court must construe these facts in favor of the nonmovant.   *Luckett v. Bethlehem Steel Corp.,* 618 F.2d 1373, 1377 (10th Cir. 1980).

The Court finds that Plaintiffs have sufficiently stated claims which come under the Fourth Amendment and thus have satisfied the first part of their burden under the qualified immunity standard.   *See Childress v. City of Arapaho*, 210 F.3d 1154 (10th Cir. 2000) (to state a claim under Fourth Amendment in §1983 action, plaintiffs must show both that a "seizure" occurred and that the seizure was unreasonable).

B.      Fourth Amendment-Initial Stop and Detention

The Fourth Amendment protects individuals from unreasonable searches and seizures. *United States v. Holt*, 264 F. 3d 1215, 1220 (10th Cir.2001).  Stopping a vehicle and detaining its occupants constitutes a seizure under the Fourth Amendment, *United States v. Edgerton*, 438 F.3df 1043, 1047 (10th Cir.2006); and its reasonableness is examined by "both the length of the detention and the manner in which it is carried out."   *U.S. v. Holt*, 264 F. 3d 1215, 1230 (10th

Cir.2001); *U.S. v. Oliver*, 363 F.3d 1061, 1067 (10th Cir. 2004) (the "reasonable suspicion" standard governs whether a seizure, or the continuation of a seizure, is constitutional).

Once reasonable suspicion is formed, the officer is entitled to initiate an investigatory detention in order to dispel that suspicion. *United States v. Sokolow*, 490 U.S. 1, 30-31 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 22 (1968)). Police officers may "pursue short, limited investigations infringing on the individual's freedom of movement based on less than probable cause to arrest." *Bierley v. Schoenfeld*, 781 F.2d 838, 841 (10th Cir. 1986). An officer can detain an individual if the officer can point to "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. *Terry*, 392 U.S. at 21. Whether a person has been "seized" in the context of a *Terry* stop and within the meaning of the Fourth Amendment is based on the totality of the circumstances and depends on whether a reasonable person would believe that she is not free to leave or to decline an officer's requests. *Florida v. Bostick*, 501 U.S. 429, 439 (1991); *U.S. v. Mendenhall*, 446 U.S. 544, 554 (1980); *U.S. v. Lambert*, 46 F.3d 1064, 1067-68 (10th Cir. 1995)

The scope of an investigative stop, or *Terry* stop, must be reasonably related to the circumstances which justified the interference in the first place. *United States v. Neff*, 300 F.3d 1217, 1220 (10th Cir. 2002). Courts must use common sense and look at the totality of the circumstances to determine the appropriate scope of a *Terry* stop. *Id*.

## III.   Fourth Amendment – Initial Stop

Count I alleges that a Fourth Amendment violation based on the unreasonable seizure of Mr. Martinez, which the Court addresses here in the context of the initial stop. A *Terry* stop can constitute a seizure when, based on the totality of the circumstances, a reasonable person would believe that she is not free to leave or to decline an officer's requests. *Florida v. Bostick*,

501 U.S. 429, 439 (1991); U.S. v. Mendenhall, 446 U.S. 544, 554 (1980); U.S. v. Lambert, 46 F.3d 1064, 1067-68 (10th Cir. 1995).

A.    Whether Defendants Are Entitled to Qualified Immunity

Defendants claim that the stop and detention was justified because carried out under a police officer's caretaking function.   It is true that the United States Supreme Court has recognized that local police officers must often "engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973).   In *United States v. King*, 990 F.2d 1552 (10th Cir. 1993), the Tenth Circuit observed that in fulfilling community caretaking responsibilities, a police officer "may have occasion to seize a person, as the Supreme Court has defined the term for Fourth Amendment purposes, in order to ensure the safety of the public and/ or the individual, regardless of any suspected criminal activity." *Id.* at 1560.

However, the exercise of an officer's caretaking function does not do away with an individual's Fourth Amendment rights.  The Tenth Circuit emphasized in *King* that Fourth Amendment protections extend to individuals seized in the course of police officers' exercise of community caretaking functions.  The court explained that a person's Fourth Amendment rights are not eviscerated simply because a police officer may be acting in a noninvestigatory capacity because "it is surely anomalous to say that the individual . . . [is] fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior."   *King,* 990 F.2d at 1560 (quoting *Camara v. Municipal Court*, 387 U.S. 523, 530 (1967).

The Tenth Circuit has applied the essential framework set forth in *Terry* for investigative stops based on less than probable cause.  *See King,* 990 F.2d at 1560.   The inquiry is twofold:

14

first, the court must ask whether the officer's conduct was "justified at its inception"; second, the court must examine whether the officer's action is "reasonably related in scope to the circumstances which justified the interference in the first place." *King,* 990 F.2d at 1557) (quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968)).   Therefore, in analyzing whether an investigative detention complies with the Fourth Amendment, this Court must determine whether there was reasonable suspicion to stop and detain Plaintiff.

The law governing the legality of initial stops was clearly established at the time of the alleged incidents.   In a sworn statement, Plaintiff states that he was never told why he was stopped, that there was no attempt on the part of the officers to determine whether he was Jason's father, and that he was stopped after simply honking his car horn in front of Jason's house. Plaintiff also states that there was no reason for the officers to believe he was Ignacio Martinez, Jr. because of his "Disabled Veteran" license plate.   Viewing the facts in a light most favorable to Plaintiff, a reasonable officer with knowledge of this law would know that the conduct as alleged by Plaintiff was unlawful.   Defendants are not entitled to qualified immunity on the initial stop because the law governing initial stops was clearly established at the time of the alleged incidents.

B.   Whether Defendants Are Entitled to Summary Judgment

Even though Defendants are not entitled to qualified immunity on the initial stop, they may still prevail if the relevant undisputed facts demonstrate that, as a matter of law, the officers acted reasonably with regard to the initial stop.   Plaintiffs do not offer any evidence that disputes the fact that Jason called 911 on seeing the red Dodge outside near his driveway and hearing the horn honking.   It is clear, on listening to the audiotape, that Jason believed, as did the responding officers, that Jason's father (Ignacio Martinez, Jr.) could have been in the car.

Jason's girlfriend Crystal stated that she could see Jason's grandmother through the tinted window on the passenger side but could not see the driver. (Defts' Ex. A, "First Officer Encounter," at 2:00).  Officers Mares and Jackson, who were dispatched in response to Jason's call, waited near Jason's property to see if the red car would return.

There are factual disputes on what Jason told Officer Mares after Officer Mares arrived at the scene, but it is undisputed that at the time of the initial stop, Officer Mares was responding to a perceived threat to Jason that had been called into police dispatch.  When Jason and his girlfriend tried to leave the property and were blocked by Plaintiff's car, the officers had reasonable suspicion to stop Plaintiff to determine whether it posed a threat to Jason.  At that point, while the stopping of Plaintiff's vehicle constituted a seizure for purposes of the Fourth Amendment, the officers were clearly exercising their caretaking function and are entitled to summary judgment on the initial stop.

## IV.   Fourth Amendment – Continued Detention (Identification and Handcuffs)

Plaintiff alleges that Defendant officers violated his Fourth Amendment rights by their actions during the continued detention following the stop, including requiring him to produce his wallet, and handcuffing him.  The inquiry here is whether the detention was reasonably related to the circumstances which justified the interference in the first place.

A.   <u>Whether Defendant Officers Are Entitled to Qualified Immunity</u>

The legal standards governing identification requests and handcuffing are well-established in the Tenth Circuit.  An officer may ask a suspect to identify himself during a *Terry* stop.  *United States v. Hensley*, 469 U.S. 221, 229 (1985); *U.S. v. Villagrana* (467 F.3d 1269 (10th Cir. 2006) it is well established that [the] officer may ask a suspect to identify himself in the course of a Terry stop.  Also, police officers are authorized to take such steps that are

16

reasonably necessary to protect their personal safety and to maintain the status quo during the course of a *Terry* stop, including the use of handcuffs. *Gallegos v. City of Colorado Springs*, 114 F.3d 1024, 1030 (10th Cir. 1997); *United States v. Hensley*, 469 U.S. 221, 235 (1985)). The hallmark of the Fourth Amendment is reasonableness. As long as the precautionary measures employed by officers during a Terry stop are reasonable, they will be permitted without a showing of probable cause. *Gallegos,* 114 F.3d at 1030; *see also U.S. v. Neff,* 300 F.3d 1217, 1220 (10th Cir. 2002). Because these legal standards were well established at the time of the alleged incidents, Defendants are not entitled to qualified immunity.

B.      Whether Defendant Officers Are Entitled to Summary Judgment

The parties dispute whether Plaintiff had his driver's license already out when Officer Mares approached, or whether Plaintiff was still trying to get the wallet out of his pocket when he was ordered out of the car.[9] However, it is undisputed that Plaintiff was ordered to step out of the car, and told to put the wallet on the car. Plaintiff complied after initially refusing to do so, and was handcuffed.

Defendants acknowledge that the officers' "immediate concern" was whether Ignacio Martinez, Jr. had come back to hurt or kill his son ("to finish the job"). *See* Doc. 38 at 3. When Officers Mares and Jackson first spoke with Jason, prior to their stopping Plaintiff's car when it reappeared at the property, they were obviously and reasonably under the impression that Jason feared his father had returned. Jason recognized the car as his grandfather's, but he also mentioned that his father was "vehicle-less" after he wrecked his car. Defts' Ex. A, Audiotape, "First Officer encounter" at 2:30 and 4:14-4:19. Thus, it was reasonable at that point for the

---

[9] The audiotape is not much help here. Officer Mares' audiotape (Ex. 6) begins with Plaintiff being ordered to step out of the car, so there is no way to know whether Plaintiff was asked for identification before being ordered out of the car. Audiotape at :34-42.

officers to expect that the red Dodge Magnum could be driven by Jason's father, based on the general information received from dispatch and from the officers' first contact with Jason.

After Plaintiff was stopped, however, Jason was not immediately approached to question whether the driver was his father. The Court has no way of knowing whether the officers checked Plaintiff's wallet, after Plaintiff placed it on the car, to determine whether Plaintiff was Ignacio Martinez, Jr. Officer Gonzales arrived during the time Plaintiff was being handcuffed and advised the other officers that Plaintiff was not the individual who had previously shot Jason, and that Plaintiff was Jason's grandfather.

It is undisputed that Officer Mares ordered Jason and Crystal back into the house without first asking Jason if the driver of the car that was stopped was his father. In his deposition, Officer Mares stated that he "didn't know" if that would have been the obvious thing to do, and thereby avoid the subsequent incidents. Doc. 31-1 at 35-36.[10] It is also undisputed that Officer Mares never told Plaintiff the reason for the stop or why the officers were detaining him. Doc. 31-1 at 82. The audiotape also indicates that Officer Mares did not ask Jason if Plaintiff was Ignacio Martinez, Sr., or Ignacio Martinez, Jr., until after Plaintiff had been handcuffed and was being searched for weapons, even though Jason had remained outside during the entire incident. Ex. 6, Audiotape, 3:20.

The reasonableness of an investigative detention is based on whether the officers' actions are reasonably related in scope to the circumstances which justified the interference in the first place. *Gallegos,* 114 F.3d at 1028. The question here is whether it was reasonable for the officers to detain Plaintiff and handcuff him after Plaintiff had refused to place his wallet on the car, thus broadening the scope and length of the detention.

---

[10]  Despite Officer Mares' orders to Jason to get inside (Doc. 14-1, ¶¶7, 9), Jason remained outside the house for the entire time—from the time Jason was initially told to go into the house, up until the time Plaintiff was released. Doc. 31-1 at 112-113.

There is evidence which disputes Defendants' factual contentions that Plaintiff was "yelling and screaming" at the officers as well as the degree of Plaintiffs' cooperation to justify handcuffing.   There is certainly evidence that Plaintiff did not initially comply with Officer Mares' commands to step out of his car.   Plaintiff finally did exit the vehicle after about ten seconds after verbally refusing to do so.     Audiotape, Ex. 6 at :46-:58.     Officer Mares then ordered Plaintiff to put his wallet on the car.  Ex. 6 at 1:01.   Plaintiff refused once, saying that it was his personal property.   Ex. 6 at 1:04.   There is about nine seconds in which Plaintiff either could have been trying to retrieve his wallet from his pants pocket (Plaintiff's version) or Officer Mares is already proceeding to handcuff Plaintiff.

It is not clear whether there is a dispute about what Plaintiff was ordered to do between the time he was ordered to step out of the car and the time he was handcuffed.   In his affidavit, Officer Mares implies that Plaintiff was ordered to move away from the driver's side of the door in order to be out of reach of any possible weapons, since he claims that Plaintiff refused to do so.  Doc. 14-1, ¶ 12.   In his deposition, Officer Mares did not recall if he told Plaintiff to go to the back of the car.  Doc. 31-1 at 57:9-1.   Plaintiff disputes that he was asked to move away from the driver's door.   There are no definitive sounds on the audiotape that would resolve this issue; after the nine-second interval, one can hear sounds that are presumably the voice of Plaintiff complaining that the officers are hurting him while he is being handcuffed.  Ex. 6 at 1:13.[11]   This evidence supports the facts as presented by Plaintiff to dispute the lawfulness of the continued detention.

---

[11]   Plaintiff does not allege a separate excessive force claim, but rather claims that the force the officers used while handcuffing was more than reasonably necessary.   Under Tenth Circuit precedent, if Plaintiff successfully proves an unlawful arrest or seizure, he would be entitled to damages for the unlawful arrest, which includes damages resulting from any force reasonable employed in effecting the arrest.   *See Romero v. Story*, 672 F.3d 880 (10th Cir. 2012) (citing *Cortez v. McCauley*, 478 F.3d 1108, 1114-15 (10th Cir. 2007).   A separate and independent excessive force inquiry is necessary only where a plaintiff also alleges excessive force.  *Id.*

Other than Plaintiff refusing to step out of the car and refusing to put his wallet on the car, the Court can discern from the audiotapes no sounds of Plaintiff "yelling and screaming" at the officers.   Also, based on evidence provided by the Plaintiff and the audiotapes, because the officers did not seek to obtain information through Plaintiff as to his identity, they did not know who Plaintiff was until Officer Gonzales advised the other officers that Plaintiff was not the individual who shot Jason during the handcuffing.

Viewing the evidence favorably to Plaintiff, a reasonable juror could find that it was not reasonably necessary to handcuff Plaintiff in order to either protect Defendants' personal safety or to obtain Plaintiff's compliance.   A reasonable juror could also find that the officers did not act reasonably in addressing their immediate concern, which was to determine whether the driver of the red Dodge Magnum was Jason's father.   Both of the car's occupants were clearly elderly,[12] the car had a disabled veteran's license plate which was visible to the officers, and Plaintiff had placed his wallet on the car which could have provided the officers with information as to Plaintiff's identity as Jason's grandfather instead of Jason's father.   Instead, Officer Mares' testimony is that Plaintiff was asked to place the wallet on the car because "[a] wallet could be a weapon" containing knives or razor blades.  Doc. 31-1 at 107.

For these reasons, Defendants are not entitled to summary judgment on alleged Fourth Amendment violations based on the continued detention of Plaintiff.

## V.   Fourth Amendment – Search for Weapons

The last section of the investigatory detention involves the pat-down search of Mr. Martinez, Sr.   *See Terry v. Ohio,* 392 U.S. at 1 (a pat-down is a "search" under the Fourth Amendment).

---

[12]   Officer Mares admitted in his deposition that he realized he had two elderly people in the vehicle.  Doc. 31-1 at 40:21-23.

A.     <u>Whether Defendants Are Entitled to Qualified Immunity</u>

Defendants argue that the law is on their side for this issue, noting that "Plaintiffs have not cited any cases, and Defendants are not aware of any cases, which prevent the Officers from patting down the suspect to ensure he is not armed before being released under these circumstances." Doc. 38 at 7.   This is technically a correct statement of the law, but implicit in the statement is the assumption that the officers conducting the search must have a basis for believing the individual is armed.    A search for weapons is legal under the Fourth Amendment when (1) the investigatory stop or temporary detention is lawful, and (2) the officer reasonably suspects that the person stopped is armed and dangerous.   *Arizona v. Johnson,* 129 S.Ct. 781 (2009); *U.S. v. Wald,* 208 F.3d 902, 906 (10th Cir. 2000).   This law was clearly established at the time of the alleged incidents, such that the Defendant officers would have known they were violating Plaintiff's rights by searching Plaintiff for weapons without reasonable suspicion that he was armed.

B.     <u>Whether Defendants Are Entitled to Summary Judgment</u>

The timeline facts are undisputed.    Plaintiff was searched for weapons after Officer Gonzales advised Officers Mares and Jackson that Plaintiff was not Jason's father.   Officer Mares stepped away to speak with Jason.   Officer Gonzales told Plaintiff that he was going to do a "quick check," and Officer Jackson actually conducted the search.    In other words, it is undisputed that the pat-down was done after the officers had resolved their immediate concern, which was whether the driver of the red Dodge Magnum—was Ignacio Martinez, Jr., and knew that Plaintiff was Ignacio Martinez, Sr.[13]

---

[13]   Defendants offer no material facts to dispute this timeline.  Officer Mares lack of recall concerning whether the pat-down was done before or after Officer Gonzales arrived is insufficient to rebut either Officer Gonzales' testimony or the evidence from the audiotape.

This timeline having been established, Plaintiff also presents evidence that raises substantive issues concerning a lawful basis for a weapons search.   Officer Gonzales testified that at the time the pat-down was conducted, there was no suspicion that Plaintiff had committed a crime.  Doc. 31-2 at 33:13-17; at 30:14-21; 33:13-17.   Officer Mares testified that he saw no weapon when he was talking to Plaintiff and he had no information that Ignacio Martinez, Sr. was armed.   Officer Mares also testified that Jason did not say he had seen anyone in the car with a weapon.   While the officers may have reasonably believed that Plaintiff could be Jason's father at the time of the initial stop, and therefore some reason to believe the driver of the car could possibly be armed, they clearly knew prior to searching the Plaintiff for weapons that Plaintiff was not Jason's father, and therefore the reason for believing Plaintiff was possibly armed had been vitiated.   *See* Doc. 31-1 at 79:5-8 and 80-81.   In his deposition, Officer Mares admitted that once he was advised that Plaintiff was not Jason's father, he had no reason to detain Plaintiff.   Doc. 31-1 at 79:5-8 and 16-25.  *See U.S. v. De La Cruz,* 703 F.3d 1193, 1197 (10th Cir. 2013) (once reasonable suspicion has been dispelled, "[e]ven a very brief extension of the detention without consent or reasonable suspicion violates the Fourth Amendment").

Based on the existence of these disputed material facts, a reasonable juror could find that the Defendant officers violated Plaintiff's Fourth Amendment right by searching him without legal justification for believing that he was armed; and thus, Defendants are not entitled to summary judgment on this claim.

## VI.   Plaintiffs' State Law Tort Claims (Counts V, VI and VII)

In Counts V, VI and VII, Plaintiffs assert claims of false arrest and imprisonment, battery and unlawful search and seizure under the New Mexico State Constitution.   Defendants' argument for these claims consists of a short generic recitation of the law contained in the

22

Restatement of Torts, stating that the officers had legal justification to arrest and that they were constitutionally entitled to use all the force reasonably necessary in order to effect an arrest.

The Court's ruling on Defendants' motion for these claims will be as summary as Defendants' argument:  in light of the many material disputes of fact surrounding the legality of the detention and search for Fourth Amendment purposes, summary judgment is also precluded on Plaintiffs' state law claims as well.

## CONCLUSION

In sum, the Court finds and concludes that Defendants are entitled to summary judgment on Plaintiffs' claim of a Fourth Amendment violation based on the initial stop.  However, Defendants are not entitled to summary judgment for Plaintiffs' Fourth Amendment claims based on the alleged continued detention and the pat-down search (covering Counts I, II and III).

The Court also finds and concludes that Defendants' motion for summary judgment is denied with regard to Plaintiffs' state law claims under the Tort Claims Act (Counts V, VI and VII), in light of the considerable number of material disputes of fact surrounding the legality of the detention and search.

The remaining Plaintiffs' claims have not been addressed by the Court, based on Plaintiffs' representations in the response brief that the parties have agreed to defer such claims until the Court rules on the instant motion, and discovery resumes:  First Amendment Retaliation claim (Count IV); disability claims under the ADA and §504 of the Rehabilitation Act of 1973 (Count VIII); and the municipal liability claim (Count IX).

**THEREFORE,**

**IT IS ORDERED** that Defendants' Motion for Summary Judgment **(Doc. 14)** is hereby:

- GRANTED as to Plaintiffs' Fourth Amendment claim based on the initial stop;

- DENIED as to Plaintiffs' Fourth Amendment claims based on the continued detention and the search (all covering Counts I, II and III); and

- DENIED as to Plaintiffs' claims brought under the New Mexico Tort Claims Act (Counts V, VI and VII).


_____

UNITED STATES DISTRICT JUDGE