IN THE UNITED STATES DISTRICT COURT

DISTRICT OF NEW MEXICO

IGNACIO MARTINEZ, SR. and
CHARLOTTE MARTINEZ,

      Plaintiffs,

      v.                                          Civ. No. 1:14-cv-00041 WJ-KBM

PAUL MARES, ROBERT GONZALES,
BLAIR JACKSON, in their individual capacities, and
THE CITY OF RATON,

      Defendants.

**<u>MEMORANDUM OPINION AND ORDER
GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

      THIS MATTER comes before the Court upon Plaintiff Ignacio Martinez Sr.'s Amended Motion for Partial Summary Judgment Against the Individual Defendants, filed July 21, 2014 **(Doc. 36)**. Having reviewed the parties' briefs and applicable law, the Court finds that Plaintiff's motion is well-taken and shall be granted in that Plaintiff is entitled to summary judgment on his Fourth Amendment claims based on his continued detention and the pat-down search.

**BACKGROUND**

      The underlying incident began on December 23, 2012, when Plaintiff and his wife (77 and 80 years old, respectively) drove their car, a red Dodge Magnum, to the home of their grandson Jason Martinez ("Jason") to bring a Christmas present. The incident ended a short

time later, with Defendants allegedly violating Plaintiffs' Fourth Amendment rights.[1] In this motion, Plaintiff ("Ignacio Martinez Sr." or "Mr. Martinez Sr.") seeks partial summary judgment on his Fourth Amendment claims against the individual defendant officers who allegedly detained him in handcuffs and then subjected him to a pat-down search in violation of his constitutional rights.[2] Defendants filed their own motion for partial summary judgment, and the Court has ruled on that motion. The Court concluded that in responding to the dispatcher to Jason's house, and in initially stopping Plaintiff's car to investigate the potential violation of a protective order that Jason had obtained against his father after the shooting incident, Defendants were entitled to summary judgment in exercising their caretaking function under the Fourth Amendment. Doc. 42 at 16. However, the Court denied Defendants' motion for summary judgment on the detention and weapons search, on which Plaintiff now seeks summary judgment. Doc. 42.

## DISCUSSION

Plaintiff's motion is limited to the continued detention and pat-down search for weapons that was conducted after Plaintiff was handcuffed. Plaintiff alleges that Defendants forcefully arrested Mr. Martinez even though the officers had no lawful reason to believe that he posed a threat either to the officers or to Jason. Plaintiff also contends that the pat down search was unreasonable because Defendants had no particularized and objective information amounting to reasonable suspicion to believe that he was armed. As a result of the rough manner in which one of the officers conducted the pat-down search, Plaintiff's colostomy bag was perforated, causing

---

[1] *See* Doc. 42 at 2-3 for a description of Plaintiff's other claims raised in the complaint. The instant motion concerns itself only with Plaintiff's Fourth Amendment claims.

[2] There are two named Plaintiffs in this case, but the bulk of alleged Fourth Amendment violations concern Mr. Ignacio, Sr. Charlotte Martinez was detained as well and was required to keep her arm stretched out on the car's dashboard during the entire detention. *See* Doc. 42 at 11, n.8. She claims that she was emotionally traumatized and suffered extreme physical pain due to the unreasonable manner in which she was detained.

his stoma to bleed and fecal matter to leak. Plaintiff also required surgery as a result of significant injury to his index finger. He alleges injuries in the form of continued significant physical injuries and emotional distress, as well as continued medical expenses as a result of Defendants' conduct. Defendants contend that they were simply responding to a potentially threat to Jason Martinez and that they had the right and obligation to ensure that the driver of the car was not armed.

**I.      Undisputed Facts[3]**

There are few facts which are disputed, given that the bulk of Defendants' responses to Plaintiff's statement of facts consists of denials of those statements, rather than an affirmative submission of conflicting evidence. *Blossom vs. Yarbrough*, 429 F.3d 963, 967 (10th Cir. 2005) (party does not create dispute of fact by refusing to admit moving party's facts). Defendants' failure to present real evidence leaves Plaintiff's statement of facts pertaining to the Fourth Amendment claims largely undisputed. Also, Defendants have attached a second affidavit of Defendant Mares which adds statements that contradict certain statements made by Defendant in his earlier deposition. The Court agrees with Plaintiff in characterizing this second affidavit as an attempt to create sham facts and so this recent affidavit will not be considered. *See Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 807 (1999) (party cannot create issue of material fact through sworn statement contradicting previous deposition testimony); *see also Burns v. Bd. of County Comm'rs*, 330 F.3d 1275 (10th Cir. 2003) (on summary judgment, corrections to county employee's deposition, in employment discrimination action, were subject to same analysis as that used to determine whether summary judgment affidavits, which

---

[3]   Since the facts presented here are supported by the parties' exhibits (unless otherwise noted), the Court sees no need to cite to all exhibits referenced.

contradicted affiant's sworn testimony, presented sham issue, so as to be precluded from consideration).

     A.    Initial Stop

Prior to Plaintiff's arrival at Jason's home, Defendants Mares, Jackson and Gonzales ("Defendants") had responded to a call from the Raton Police Department dispatching them to Jason's house. The dispatcher told the officers that Jason had seen a red car driven by his father pull up to his house and honk the horn. Defendants were investigating the potential violation of an order of protection Jason had obtained against his father, Ignacio Martinez, Jr. (who had shot Jason two months earlier). Jason had seen Plaintiff's car approach his house honking but did not come out fearing that it was his father, and called the police department.[4]

Defendant Mares was the senior officer at the scene; Defendant Jackson was a trainee. Defendant Gonzales was at the scene initially in response to the dispatch, and then returned when Plaintiff's car was seen again near Jason's residence. After arriving at Jason's house, Defendants spoke with Jason and his girlfriend Crystal, and were told that a red Dodge Magnum owned by Jason's grandfather (Plaintiff Ignacio Sr.) had driven up to the front of his house and honked the horn. Defendants were also told that Jason's grandmother, Plaintiff Charlotte Martinez, was in the passenger seat but that Jason and Crystal had not seen who the driver was. Defendants dispute whether they knew on their initial visit that Charlotte Martinez was in the passenger seat. However, statements made by Defendant Mares in his deposition appear to be consistent with Plaintiff's recollection of the facts. Mares stated that when Jason told him that he saw his grandfather's car pull up to the front of his resident, he did not know who was

---

[4] Defendant "deny" these statements, claiming that the motive of the driver was unknown to the officers (Resp. to Pltff's Fact No. 1) and because their "primary concern" was whether Jason's father had returned to kill Jason (Resp. to Pltff's Fact No. 2). These responses do not contradict Plaintiff's statements at all, and the Court will ignore such these responses and others which are either immaterial or which fail to create any dispute of fact.

driving, but that Crystal told him that she saw Charlotte Martinez in the car.  Doc. 36-2 at 18-19.[5]  Even as a disputed issue, it bears no significance because it relates to the lawfulness of the initial stop, on which the Court has already granted summary judgment to Defendants.

Defendants then left the scene, parking a short distance away and kept an eye on the residence.  The officers observed Plaintiffs' car drive up to Jason's house.  They exited their car and walked over to Plaintiffs' car and saw Plaintiff in the driver's seat and Charlotte Martinez in the passenger seat.

A.     Detention and Handcuffing

At some point, Plaintiff was told to exit his vehicle.  When he did so, the officers got hold of Plaintiff's arms and handcuffed Plaintiff with his hands behind his back.  Prior to the moment he was handcuffed, Plaintiff had not tried to physically resist the officers.   Defendants had no information that Plaintiff was armed, and had observed no weapon in the car.  Defendant's only response to these facts is to make the conclusory statement that "[a]ny person armed with deadly force poses a potential threat," without providing a single fact suggesting that the officers believed Plaintiff might be armed at that point.

Plaintiff does not furnish any details concerning the time frame from the beginning of the stop until the time he is asked to exit his vehicle, but Defendant provides no details either in the response.    In their own motion for summary judgment, Defendants had provided evidence that Plaintiff had refused the officers' initial commands to exit the vehicle.  There was also evidence that Plaintiff was reluctant to place his wallet on the car, and that there was about nine-second interval between being asked to do so a second time and being handcuffed.  See Doc. 14 at 5 and

---

[5]  Defendant Mares' second affidavit adds a paragraph stating that "[d]uring my initial interview with Jason Martinez I did not know who owned the Red Dodge Magnum, who was driving or who was in the vehicle."  Doc. 45-1, ¶ 7.  This statement is not in Defendant Mares' first affidavit, and the Court views this additional paragraph, and any other additions in the second affidavit that attempt to rehabilitate statements Defendant Mares made in his deposition, as an effort to create sham facts, as noted earlier, which will not be considered.

Doc. 42 at 7, 19.  In their response to Plaintiff's motion, however, Defendants do not provide any facts which would suggest that Plaintiff failed to comply with the officers' command to get out of his car.  The Court is not obliged to search the record in an effort to determine whether there exists "dormant evidence which might require submission of the case to a jury."  *Gross v. Burggraf Construction Co.,* 53 F.3d 1531, 1546 (10th Cir. 1995).

Plaintiff also claims that he was not "yelling and screaming" at the officers, as Defendant Mares stated in his deposition testimony.  (Doc. 31-1 at 56:21).  He observes, correctly, that Mares' statement is inconsistent with his later statement in his deposition that Plaintiff was *not* yelling and screaming, but rather that Plaintiff stated that his wallet was his "personal stuff" when he refused initially to comply with Mares' order to present his wallet.  Defendant Mares considered Plaintiff's refusal to be a lack of cooperation on Plaintiff's part, but Plaintiff's statement in refusing to put his wallet on his car does not constitute "yelling and screaming." Doc. 31-1 at 105:10-15.  Defendants claim that Plaintiff does not accurately represent the cited deposition portions.  *See* Doc. 45 at 10, n.1.  However, based on the Court's review of Defendant Mares' deposition, Plaintiff's account is accurate and complete.[6]

B.      Pat-Down Search for Weapons

Defendant Gonzales went back to the scene after Defendant Mares called him to advise that the red car had returned.  He saw Defendants Mares and Jackson with Plaintiff, all of them standing behind Plaintiff's car.  As he was walking toward them, Defendant Gonzales heard Plaintiff say "I'm hurt.  I'm hurt," heard one of the officers tell Plaintiff to put his hands behind his back and saw Defendants Mares and Jackson place Plaintiff in handcuffs.  Defendants claim that the deposition testimony cited by Plaintiff does not support the statements in Plaintiff's Fact

---

[6]  Neither party provides the cited references as an exhibit to the instant motion.  For reference, the Court was required to refer to the deposition pages attached to an earlier pleading, Doc. 31 (Pltffs' Resp. to Defts' SJ).

No. 7.  However, Defendant Gonzales' deposition testimony, on which Plaintiff relies, describes the situation exactly as Plaintiff presents it.  Defendant Gonzales came upon the scene as the other two officers were handcuffing Plaintiff, and heard Plaintiff protest that he was hurting.  Ex. 3 at 13-28.

Defendant Gonzales had cause to know Mr. Martinez, Sr., and so knew immediately that the person Defendants Mares and Jackson were handcuffing was the wrong person in that Plaintiff was not Jason's father.   Defendant Gonzales told them that the person they were detaining was not Jason's father but his "grandpa"; nor was he aware of any offense that Mr. Martinez Sr. had committed or that he was being investigated for.   Defendant Mares did not dispute what Defendant Gonzales told him.  Mares understood that once he had been told they had the wrong person, the officers had no legal authority to continue to detain him and that there was no basis to do anything with him but release him.

It is undisputed that Defendants Mares and Jackson conducted the pat-down search of Plaintiff after Defendant Gonzales informed them that the person they had detained was Jason's grandfather, not his father; and that Plaintiff was kept in handcuffs until after the pat down search was completed.  Even after being informed that Plaintiff was not Jason's father, Defendant Mares continued to detain Plaintiff in handcuffs and informed Plaintiff that he was not under arrest but that they were "trying to figure out" what was going on at the scene.  He also told Plaintiff that they were going to pat him down "to make sure you don't have a weapon." Defendants' only response to these factual statements is that "[t]he circumstances demanded that the driver be checked for weapons before being released," with absolutely no presentation of any circumstances that would suggest a need for the officers to search Plaintiff for weapons.  Defendant Mares walked off to talk with Jason, who had been outside during the incident, while

7

Defendants Gonzales and Jackson walked Plaintiff over to the police vehicle. Plaintiff was still in handcuffs.[7]

Plaintiff told Defendant Gonzales that he was disabled and asked them to be careful during the search because he had "a plastic stomach." Defendant told Plaintiffs that Defendant Jackson was "just going to do a quick check and as soon as he's finished, we're going to take the handcuffs off." Defendant Jackson then did the pat down search while Defendant Gonzales watched. Defendant Mares did not see the search as it was being conducted because he had gone to talk with Jason Martinez. After the handcuffs were taken off Plaintiff and both Plaintiffs were allowed to leave.

Plaintiff went to the emergency room after he was released, complaining, *inter alia,* that his stoma (which attaches his intestines to his colostomy bag), was hurting. Defendants deny this fact as well, despite ample evidence to the contrary in the form of affidavits of Plaintiff and his wife (Docs. 31-4 and 31-5); an Emergency Nursing Record (Doc. 31-7); and the affidavit of the orthopedic surgeon who performed surgery on Plaintiff's hand (Doc. 31-8). *See* Doc. 31 (Pltffs' Resp. to Defts' Mot. for Sum. J.). Defendants also contend that Plaintiff's statement concerning his injuries is irrelevant at this time since the Court has limited discovery to specific issues regarding the initial stop. However, the Court finds the statement relevant and material to circumstances surrounding the pat-down search carried out after Defendants were told that Plaintiff was not the person they initially believed, and after being advised by Plaintiff that he had a colostomy bag.

## II. Legal Standard

---

[7] Defendants' "response" to this fact (Plaintiffs' Fact No. 13), is evasive and non-responsive, consisting of a generic denial and the statement that Plaintiff was released "as soon as the Officers determined he was not armed." Doc. 45 at 11, ¶12. Whether Plaintiff was released *after* he was searched for weapons is not responsive to the only real question here, which is whether circumstances gave reason for the officers to conduct a weapons search in the first place.

A.       Qualified Immunity

Defendants have asserted the defense of qualified immunity, which shields government officials from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Romero v. Story*, 672 F.3d 880 (10th Cir. 2012). For a right to be clearly established there must be Tenth Circuit or Supreme Court precedent close enough on point to make the unlawfulness of the officers' actions apparent. *Weise v. Casper*, 593 F.3d 1163, 1167 (10th Cir.2010). Defendants' assertion of the qualified immunity defense requires Plaintiffs to bear the burden of demonstrating that (1) Defendants violated a constitutional right and (2) the constitutional right was clearly established at the time of the alleged conduct. *Reeves v. Churchich*, 484 F.3d 1244, 1250 (10th Cir.2007).

In this motion, Plaintiff is the movant. Unless the Court finds that Defendants are entitled to qualified immunity because the law is not sufficiently clearly established, Plaintiffs may ultimately prevail in summary judgment by satisfying the usual summary judgment standard of showing that no material facts are in dispute and that he is entitled to judgment as a matter of law. *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002). For purposes of this motion, the Court must construe these facts in favor of Defendants as non-movants. *Luckett v. Bethlehem Steel Corp*., 618 F.2d 1373, 1377 (10th Cir. 1980).

As a threshold matter for the qualified immunity analysis, the Court finds that Plaintiffs have sufficiently stated claims which come under the Fourth Amendment and thus have satisfied the first part of their burden under the qualified immunity standard. *See Childress v. City of Arapaho*, 210 F.3d 1154 (10th Cir. 2000) (to state a claim under Fourth Amendment in §1983

9

action, plaintiffs must show both that a "seizure" occurred and that the seizure was unreasonable).

B.     Fourth Amendment-Initial Stop and Detention

The Fourth Amendment protects individuals from unreasonable searches and seizures. *U.S. v. Holt*, 264 F. 3d 1215, 1220 (10th Cir.2001). Stopping a vehicle and detaining its occupants constitutes a seizure under the Fourth Amendment, *U.S. v. Edgerton*, 438 F.3df 1043, 1047 (10th Cir.2006); and its reasonableness is examined by "both the length of the detention and the manner in which it is carried out." *U.S. v. Holt*, 264 F. 3d 1215, 1230 (10th Cir.2001); *U.S. v. Oliver*, 363 F.3d 1061, 1067 (10th Cir. 2004) (the "reasonable suspicion" standard governs whether a seizure, or the continuation of a seizure, is constitutional).

Once reasonable suspicion is formed, the officer is entitled to initiate an investigatory detention in order to dispel that suspicion. *United States v. Sokolow*, 490 U.S. 1, 30-31 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 22 (1968)). Police officers may "pursue short, limited investigations infringing on the individual's freedom of movement based on less than probable cause to arrest." *Bierley v. Schoenfeld*, 781 F.2d 838, 841 (10th Cir. 1986). An officer can detain an individual if the officer can point to "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. *Terry*, 392 U.S. at 21. Whether a person has been "seized" in the context of a *Terry* stop and within the meaning of the Fourth Amendment is based on the totality of the circumstances and depends on whether a reasonable person would believe that she is not free to leave or to decline an officer's requests. *Florida v. Bostick*, 501 U.S. 429, 439 (1991); *U.S. v. Mendenhall*, 446 U.S. 544, 554 (1980); *U.S. v. Lambert*, 46 F.3d 1064, 1067-68 (10th Cir. 1995)

The scope of an investigative stop, or *Terry* stop, must be reasonably related to the circumstances which justified the interference in the first place. *U.S. v. Neff*, 300 F.3d 1217, 1220 (10th Cir. 2002). Courts must use common sense and look at the totality of the circumstances to determine the appropriate scope of a *Terry* stop. *Id*.

### III. Fourth Amendment—Continued Detention and Handcuffing

This part of Plaintiff's Fourth Amendment claim is premised on whether Defendants continued detention and restraint of Plaintiff was lawful even after they knew that he was not the individual they believed was a potential threat to Jason.

A. <u>The Relevant Law Was Clearly Established</u>

At the time of the underlying incident, the law was clearly established that police officers are authorized to take such steps that are reasonably necessary to protect their personal safety and to maintain the status quo during the course of a *Terry* stop, including the use of handcuffs. *Gallegos v. City of Colorado Springs*, 114 F.3d 1024, 1030 (10th Cir. 1997); *United States v. Hensley*, 469 U.S. 221, 235 (1985). The hallmark of the Fourth Amendment is reasonableness. As long as the precautionary measures employed by officers during a *Terry* stop are reasonable, they will be permitted without a showing of probable cause. *Gallegos*, 114 F.3d at 1030; *see also U.S. v. Neff*, 300 F.3d 1217, 1220 (10th Cir. 2002).

An investigative detention is "a seizure within the meaning of the Fourth Amendment but, unlike an arrest, it need not be supported by probable cause." *See Cortez v. McCauley,* 478 F.3d 1108, 1115 (10th Cir. 2007). The reasonableness of an investigative detention is based on whether the officers' actions are reasonably related in scope to the circumstances which justified the interference in the first place. *Gallegos*, 114 F.3d at 1028. The use of firearms, handcuffs "'and other forceful techniques' generally exceed the scope of an investigative detention and

11

enter the realm of an arrest" which requires a showing of probable cause. *Cortez,* 478i F.3d at 115-16. However, the existence of officer safety concerns allow officers "in appropriate circumstances" to take steps "to protect their personal safety and maintain the status quo during a *Terry* stop, which may include a display of force or use of handcuffs. *See id.* at 1130 (citing *U.S. v. Shareef,* 100 F.3d 1491, 1507 (10th Cir. 1996)). Thus, the question here is whether Plaintiff's detention was longer than was necessary in order to address Defendants' primary concern, which was whether or not the individuals in the red Dodge Magnum were armed with deadly force and had come to kill Jason. *See U.S. v. Wallace,* 429 F.3d 969 (10th Cir. 2005) (after reasonable suspicion has dissipated an officer can extend a detention only if he either has a "reasonable articulable suspicion of other crimes or the driver voluntarily consents to further questioning).

B.  Whether Continued Detention Was Reasonable in Scope and Length

It is undisputed that the investigative detention began when Defendant Mares told Plaintiff to get out of the car. Doc. 31-1 (Mares Depo. at 45:12-15). Defendants have not presented any facts to dispute Plaintiff's statement that as soon as he exited his vehicle, Defendants Mares and Jackson detained him in handcuffs. Defendants also have not presented any facts disputing the evidence presented by Plaintiff that Defendant Gonzales approached the other two officers while they were in the process of handcuffing him, informing them that Plaintiff was not Jason's father. Finally, Defendants do not dispute that they were obliged to release Plaintiff once they knew he was not the person they suspected him to be. Doc. 36-2 at 79 (Mares Depo).

Yet, despite knowing Plaintiff was Jason's grandfather and not his father, and despite not having any information or basis to believe Plaintiff was armed, Defendants continued to detain Plaintiff and kept him in handcuffs. While Defendants could not know who was driving the red

car initially (justifying the initial stop), they knew for sure that Plaintiff was not Jason's father while they were in the process of handcuffing him.  Defendants also do not dispute that they did not make any initial inquiries of Plaintiff, explain the reason for the stop, or even ask him if he was related to Jason.  Defendants' initial encounter was to order Plaintiff out of the car.[8]  They took no measures to reasonably determine Plaintiff's identity without expanding the stop into a full-blown detention.  *Cmp. Lundstromm v. Romero,* 616 F.3d 1108, 1123 (10th Cir. 2010) (handcuffing of homeowner's girlfriend was unreasonable where officers had failed to "undertake the most rudimentary investigation" by asking the girlfriend what happened, had no reason to suspect foul play, did not act in a threatening manner nor did she refuse to cooperate and thus no reasonable basis for officers to be concerned for their safety).[9]

Defendants' response to these undisputed facts is to claim categorically that Defendant was not complying with their orders and presented a potentially lethal situation.  *See* Doc. 36-2 at 73; Resp. to Pltff's Fact No. 5.  However, they present no facts to suggest that this was so. While the use of handcuffs is indicated in situations to maintain the status quo and to protect officer safety, Defendant Mares stated in his deposition that they handcuffed Plaintiff because it was "standard procedure." Doc. 36-2 at 72.  This statement does not suggest circumstances requiring the Plaintiff be restrained or induced to comply with any particular officer command.

Defendants present no evidence, and do not dispute, that Plaintiff did not physically resist the officers, nor do they present any evidence that the Plaintiff was disruptive to the extent that handcuffing him was necessary.  *See* Doc. 36-2 at 59.  For example, at one point in his

---

[8]  Also, by the time Plaintiff had exited the vehicle, he had been asked for his wallet in which he kept his driver's license and identification.  *See* Doc. 45 at 5 & 7 (Defts' recitation of Court's findings in Mem. Op. & Order, Doc. 42).

[9]  In his deposition, Defendant Mares was asked whether it would have been "obvious" to ask Jason or his girlfriend, who were standing outside during the entire incident, whether Plaintiff was his father, even though such an inquiry would have resolved the whole incident before going any further.  Defendant's answer to this question was "I do not know."  Doc. 31-1 at 35-36 and 112:23-25.

deposition, Defendant Mares stated that Plaintiff was "yelling and screaming at the officers." The Court recognizes that it must view the facts favorably to Defendant in this motion, but Defendant Mares' testimony on this issue is insufficient to create a factual dispute for two reasons. First, as explained above, Mares' own deposition testimony is self-contradictory, first claiming that Plaintiff was "yelling and screaming" at the officers and then subsequently admitting that Plaintiff was merely initially refusing to turn over what he considered to be his "personal property." The Court is not obligated to accept as true Defendant Mares' statement that Plaintiff was "yelling and screaming" when it is contradicted by his own statements elsewhere. When opposing parties tell two different stores, "one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment. *See, e.g., Scott v. Harris*, 550 U.S. 372, 379-380 (2007) (in considering deputy's motion for summary judgment, courts had to view the facts in the light depicted by videotape which captured events underlying excessive force claim). Second, the audiotapes which the Court has reviewed (Ex. A, Audiotape from Defts' Mot. for Sum.J. and Pltffs' Exs. 6 & 9 in the Resp.) reveal no yelling and screaming at all, just Plaintiffs' barely voice of indignation in his one-time refusal to put his wallet on the car. *See* Doc. 42 at 20. For these reasons, the Court does not consider statements made by Defendant Mares to create a factual dispute to rebut the evidence presented by Plaintiff that his conduct was not aggressive or warranting restraint by handcuffs after he exited his vehicle.

     Defendant Mares also refers to "aggressive moves towards Jason" by Plaintiff's vehicle. Doc. 45-1, ¶ 13. This refers to Plaintiff pulling up his car into Jason's driveway at a high rate of speed, blocking Jason's vehicle and honking the car horn. Doc. 45-1 , ¶9. Plaintiff denies doing

this. Ex. 1, ¶ 5. However, even viewing the facts favorably to Defendants here, while this fact may provide support and a legal basis for the initial stop (for which the Court has already granted summary judgment to Defendants), it is not enough to support Plaintiff's continued detention and handcuffing.

Relevant case law supports Plaintiff's position that his continued detention was unlawful once the officers were aware that he was not Jason's father. In *U.S. v. Lopez,* the Tenth Circuit held that continued detention became unreasonable as soon as the officer, who suspected Lopez of having stolen the car he was standing next to, ascertained that the address of Lopez' driver's license matched the address of the registered owner of the car. 443 F.3d 1280 (10th Cir. 2006). The court found that the continued detention in running a warrants check, and the subsequent arrest and search constituted unreasonable seizure. Similarly, in *U.S. v. Shareef,* 100 F.3d 1491 (10th Cir. 1996), the Tenth Circuit concluded that the continued use of handcuffs constituted unlawful arrest after officers learned that the suspect they were detaining was not the individual they believed he was.

Defendants argue that Plaintiff's reliance on both *Lopez* and *Shareef* is unjustified, but the Court finds that these cases are both instructive and supportive of Plaintiff's position. Even in *Shareef,* while a thirty-minute detention was considered reasonable, the continued detention and use of handcuffs was unlawful once the purpose for the detention had dissipated. 100 F.3d at 1507-08. The defendant in *Shareef* was wanted in another state on a felony charge involving a weapon, according to information from a misinterpreted teletype from the National Crime Information Center (NCIC) computer. The Tenth Circuit held that, once the officers learned that the suspect they were detaining was not the individual identified in the NCIC teletype, "the continued use of handcuffs constituted an unlawful arrest." 100 F.3d at 1507. Defendants

15

attempt to distinguish *Lopez* by pointing out that the instant case, unlike *Lopez,* involved "multiple appearances of an aggressive and reportedly armed and dangerous driver. . . ." While the officers may have been operating under these assumptions just prior to the initial stop (which is not an issue in the instant motion), it has no relevance to the point in time during which Plaintiff was handcuffed and when there was no longer any basis to believe Plaintiff was either showing aggression or was armed and dangerous.

It is undisputed that Defendants were aware they were detaining the wrong person as they were handcuffing Plaintiff and at the very latest, when they had just handcuffed him. There are no facts suggesting there was a need to restrain Plaintiff in order to protect the officers' personal safety; and no facts suggesting that Plaintiff was resisting compliance to a degree that required handcuffing Plaintiff to maintain the status quo.

Accordingly, Defendants have presented no evidence from which a fact finder could infer that Plaintiff's conduct gave the officers any legal basis to handcuff Plaintiff; and no evidence from which a fact finder could infer that there was reasonable suspicion to continue to detain Plaintiff once they knew he was not Jason's father. As a result, the continued detention and restraint of Plaintiff was not reasonably related in purpose and scope to the reason for the initial stop. Plaintiffs are entitled to summary judgment on this issue.

**IV.     Fourth Amendment—Search for Weapons**

The last section of the investigatory detention involves the pat-down search of Plaintiff. *See Terry v. Ohio,* 392 U.S. at 1 (a pat-down is a "search" under the Fourth Amendment).

A.     <u>Law Was Clearly Established</u>

A search for weapons is legal under the Fourth Amendment when (1) the investigatory stop or temporary detention is lawful, and (2) the officer reasonably suspects that the person

stopped is armed and dangerous. *Arizona v. Johnson*, 129 S.Ct. 781 (2009); *U.S. v. Wald*, 208 F.3d 902, 906 (10th Cir. 2000). When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, the officer may conduct a pat-down search "to determine whether the person is in fact carrying a weapon." The purpose of this limited search "is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence . . . ." *Minnesota v Dickerson*, 508 U.S. 366, 373 (1993). This law was clearly established at the time of the alleged incidents, such that the Defendant officers would have known they were violating Plaintiff's rights by searching Plaintiff for weapons without reasonable suspicion that he was armed.

B.    Whether Plaintiff is Entitled to Summary Judgment on the Pat-Down Search

The Court has already discussed Defendants' failure to present evidence the officers could have reasonably believed that Plaintiff was armed or posed a threat to either the officers or to Jason at the time they conducted a weapons search. Defendants' own testimony belies any such contention. Their purported disputes of fact are premised on either conclusory statements, which do not suffice to create a genuine issue of material fact, *Ford v. West*, 222 F.3d 767, 777 (10th Cir. 2000); or they are insufficient to infer that the pat-down search conducted while Plaintiff was in handcuffs was justified.

Defendant Gonzales informed the other two officers that Plaintiff was not Jason's father, and therefore was not the person they suspected, as Plaintiff was being handcuffed. *See* Pltff's Ex. 4 (Gonzales audiotape) at .50-.55 (Gonzales informing Mares and Jackson that "Junior" had shot Jason, and that "this isn't the one. This is the grandpa"); 1.05 (Mares informing Plaintiff he was not under arrest but that a pat-down search would be conducted); *see also* Doc. 36-3 at 34

(Gonzales Depo.). Thus, even though Defendants knew that Plaintiff was not the person they initially suspected (and which gave them reasonable suspicion for the initial stop), they proceeded to conduct a pat-down search.

Defendant Mares stated in his deposition that Plaintiff's wallet could be a potential weapon, since it could contain a razor blade. Doc. 36-2, ¶107. However, the wallet was presented to the officers when Plaintiff first exited the car, and prior to his being handcuffed. At the time the pat-down was conducted, virtually *all* the evidence (including Defendants' own testimony) is that there was no reason to believe Plaintiff was armed or that he had committed a crime—which would have been exactly what is required in order to provide the officers with a legal basis for doing the search.[10] Still, Defendants proceeded to search Plaintiff for weapons before releasing him, and this conduct violated Plaintiff's Fourth Amendment rights.

For these reasons, Plaintiff is entitled to summary judgment on the pat-down search.

## CONCLUSION

In sum, the Court finds and concludes that Plaintiff is entitled to summary judgment on his Fourth Amendment claims related to his continued detention and the pat-down search. Defendants have not presented any dispute of fact to suggest that Plaintiff's behavior gave cause to the officers to restrain Plaintiff in handcuffs or to continue detaining him once they knew Plaintiff was not Jason's father, and thus the length and scope of the detention as not reasonably related scope or length to its original purpose.

---

[10] Defendant Mares inserts a convenient addition to his second affidavit stating that "in [his] judgment as a certified law enforcement officer, the driver [Plaintiff] had to be searched for deadly weapons under the circumstances." Doc. 45-1,¶15. As previously stated, the Court will not consider this late-coming effort by Mares to rehabilitate prior statements. Moreover, the statement is devoid of any specific facts which would have provided any legal basis to conduct the search and is entirely contradictory to his deposition statement that he had no reason to believe Plaintiff was armed. Doc. 36-2 at 80.

The Court also finds and concludes that Defendants have presented no evidence from which a fact finder could infer that that Plaintiff was armed and dangerous or continued to pose any threat to either Jason or the officers.  Thus, Plaintiffs are entitled to summary judgment on the pat-down search.

**THEREFORE,**

**IT IS ORDERED** that Plaintiff's Amended Motion for Partial Summary Judgment Against the Individual Defendants **(Doc. 36)** is hereby GRANTED in that Plaintiff is entitled to summary judgment on his Fourth Amendment claims based on the continued detention and pat-down search.

The Court notes that these rulings do not dispose of this case.  In their response brief, Plaintiffs state that Defendants have agreed to delay discovery on their ADA/§504 claim in Count VIII and on their municipal liability claim in Count IX until the resolution of the instant motion.  Doc. 31 at 2, n.2.   See Doc. 42 at 4.

_____
UNITED STATES DISTRICT JUDGE